# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JEREMIAH CAMPBELL, S08726,     )
                                )
            Petitioner,     )
                                )
         v.         )      23 C 1862
                                )
CHARLES TRUITT, Warden,     )
                                )
            Respondent.     )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge**:

Before the Court is Petitioner Jeremiah Campbell's petition for a writ of habeas corpus. For the following reasons, the Court denies Campbell's petition and declines to issue a certificate of appealability.

## BACKGROUND

State court factual findings enjoy a presumption of correctness absent clear and convincing findings to the contrary. 28 U.S.C. § 2254(e)(1); *Davis v. Ayala*, 576 U.S. 257, 271 (2015). The Court's analysis of the facts[1] emerges against this backdrop.

In 2006, Petitioner beat his girlfriend's 19-month-old son, Galen, to death. Prosecutors in Macon County, Illinois, charged Petitioner with first degree murder.

---

[1] We rely on the Illinois Appellate Court's recitation of the facts in *People v. Campbell*, 2013 IL App (4th) 110517-U, and *People v. Campbell*, 2022 IL App (4th) 200146-U, as the last state court to consider Petitioner's claims on the merits. *See Boyd v. Boughton*, 798 F.3d 490, 492 (7th Cir. 2015); *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003).

## I.     Conviction and Sentence

Petitioner's first trial ended in a mistrial due to a hung jury. At Petitioner's second trial, three forensic pathologists, Dr. Jessica Bowman, Dr. John Ralston, and Dr. Mary Case, offered expert testimony on Galen's cause of death. All three agreed Galen's liver injury caused or contributed to his death.  They disagreed as to the time the injury occurred.   While Dr. Bowman and Dr. Case concluded the fatal injury occurred within three hours of Galen's death, when Petitioner was alone with Galen, Dr. Ralston concluded the liver injury was older, occurring up to two days earlier.  All agreed the injuries were not caused by resuscitation efforts.

Galen's father, Galen Cole, Sr. ("Cole"), testified that he last saw Galen the day before his death. Galen appeared normal and was running around and playing. Similarly, Galen's maternal grandmother, Gayla Cooper, testified that she saw Galen on the day before his death and he appeared normal, other than having a small cold. Cole did not believe Galen had a cold or other breathing problem.

Galen's mother, Ebony, testified that she was dating Petitioner at the time of Galen's death.  The day before her son's death, Galen was playing, eating, and acting normally, though he had a small cold.   During that time, Ebony saw no signs that Galen had any pain or injuries.    Later that night, at 2:00 a.m., Petitioner came to Ebony's house after partying and drinking at a club and spent the night.  Around 6:00 a.m. the next morning, Ebony left for work, while Galen was sleeping in his own room.   Before leaving, Ebony woke Petitioner, who was sleeping in the master bedroom, and asked

him to watch Galen while she was gone; Petitioner agreed and then went back to sleep. When Ebony returned from work later that morning, Petitioner was smoking marijuana and said that Galen had blown his nose and blood came out. Ebony went to Galen's room; he was lying at the foot of his bed, in an unusual position, and was not breathing. Petitioner attempted CPR. Ebony and Petitioner took Galen to the hospital.

Galen was pronounced dead when he arrived at the hospital. He was examined by the Macon County coroner, Michael Day, who testified that Galen had "'some disturbing signs' of a traumatic event," including bruising around his head and chest, and a distended abdomen. Ebony testified that, before she left for work on the day of Galen's death, her son did not have any of the bruises that were depicted in the autopsy photographs. A police officer and Ebony testified that there was a large, sticky stain on the carpet near the bed where Petitioner slept that looked like someone had spilled juice; the stain was not there when Ebony left for work. Petitioner testified at his first trial that he awoke around 8:15 a.m. to Galen crying. Petitioner gave Galen juice and put him back to bed.

Coroner Day's testimony explains how the three experts became involved in the case. Dr. Bowman was hired as a coroner's physician for Macon County. She had worked with the retiring coroner's physician but was not board certified after having failed the certification exam multiple times. Coroner Day testified relations appeared "strained" between Dr. Bowman, law enforcement, and the state's attorney's office. Concerns had been voiced to him. When Dr. Ralston, a board-certified forensic

3

pathologist, stated he was moving to the area, Coroner Day replaced Dr. Bowman. Dr. Ralston had worked for several counties and often testified as an expert for the State. Coroner Day had no "qualms about Dr. Ralston's quality of work or his professional demeanor." After Petitioner secured an expert opinion report by Dr. Ralston, who was not yet acting as the coroner's physician when he wrote the report, Dr. Case was hired to review the conclusions of Dr. Bowman and Dr. Ralston.

Dr. Bowman testified she was a forensic pathologist licensed to practice in four states, including Illinois. Dr. Bowman testified she averaged 250 to 300 autopsies per year. Although she was not board certified as a forensic pathologist, Dr. Bowman was a board certified anatomic and clinical pathologist.

Dr. Bowman conducted an autopsy of Galen one day after his death. Bruising was scattered across Galen's chest and abdominal region. There was also bruising on Galen's forehead and in the area below his eyebrows. Dr. Bowman stated the abdomen and chest area exhibited "numerous circular bruises, some of which [were] almost confluent of a pattern . . . recognizable as that characteristically seen when caused by a fist." Galen's right arm had "faintly demonstrated marks," which could have been caused by a fist or by the act of grabbing. Dr. Bowman's internal examination revealed evidence of traumatic injury. Damaged blood vessels hemorrhaged into Galen's abdominal cavity, buttocks, back, and lung. Galen suffered two broken ribs on each side. There was no evidence of healing, indicating the ribs were recently injured.

Dr. Bowman found subdural blood in the area surrounding the brain. This blood, however, indicated an injury that was not lethal to Galen.

Regarding Galen's liver, Dr. Bowman testified Galen suffered a hemorrhage in the liver's midregion. The liver was separated, causing bleeding. The capsule surrounding the liver was torn: "[m]ostly intact with a little bit of tearing." The capsule showed no indication of healing, as the tear had "no piling up or evidence of distortion." Most of the damage to the liver was on the inside of the liver. Dr. Bowman believed the injury to the liver was recent.

Dr. Bowman opined Galen's death was due to blunt-force injury that appeared to be "contemporaneously inflicted" within, at most, a couple of hours. Dr. Bowman based her opinion on the appearance of the injuries, as well as the microscopic appearance of the injuries. Based on the extent of Galen's injuries, Dr. Bowman opined he would have lived "maybe a couple hours" after having sustained them. Dr. Bowman doubted Galen could have walked around after having suffered such injuries. Emphasizing Galen's buttocks and head injuries, Dr. Bowman believed Galen's injuries could not have been caused during resuscitation efforts.

Dr. Ralston testified he had been licensed in forensic pathology since 2003. He was board certified in anatomic and clinical pathology, as well as in forensic pathology. In July 2008, Dr. Ralston was hired as the coroner's physician for Macon County. Dr. Ralston occasionally accepted private autopsy cases and reviewed the work of others. In his career, he had performed approximately 1,100 autopsies. In this case,

5

Dr. Ralston was hired by Petitioner to review Dr. Bowman's findings and render an opinion.

Dr. Ralston opined Dr. Bowman failed to estimate or opine on the age of the fracture or hemorrhage injuries. According to Dr. Ralston, it was useful, particularly in subdural-hematoma cases, to take a microscopic section of the clotted blood to determine the age of a hemorrhage. As a hemorrhage builds, the blood would pool and the body would attempt to organize a clot by turning it into fibrous tissue and dispose of it. To determine the maturity of a clot, one could examine the clot microscopically. Here, such a test was not done.

Dr. Ralston concluded the injury that caused Galen's death more likely occurred a couple of days before his death. Dr. Ralston agreed it was possible the injury was just two to three hours old but the presence of dead tissue in the liver supported his conclusion the injury was older—one to two days old at the time of Galen's death. Dr. Ralston based this decision, in part, on the photographs from Galen's autopsy. Dr. Ralston stated one could see tissue damage with a recent hemorrhage as well as an area of tissue that turned "yellow-tan," indicating a loss of blood supply to that area and necrosis. Dr. Ralston further observed microscopically a prolonged immune response dealing with long-term consequences. A macrophage is a white blood cell that responds to specific types of infections and tissue damage. The macrophage response was predominant in the liver, further supporting his conclusion the damage to the liver was

one to two days old.  In addition, some of the rib fractures also appeared to be a few days old, while the others were a few hours or few minutes old.

Dr. Ralston opined the injury to Galen's liver was the most serious injury to Galen and blunt-force trauma from an assault was Galen's cause of death.  Dr. Ralston testified the pain of the liver injury would have been "probably of a diffuse nature." Galen would be tired and not feeling well but could have remained mobile, even eating and drinking "somewhat."  Dr. Ralston opined ibuprofen, which testimony established Galen had been taking, could have masked Galen's pain.

According to Dr. Ralston, Galen's injuries were not like those typically seen from CPR efforts. Galen's injuries were more consistent with abuse.

Dr. Case, the pathologist retained by the state's attorney's office to review Galen's death, testified she was board certified in anatomical pathology, neuropathology, and forensic pathology.  At the time of her testimony, Dr. Case served as a medical examiner for multiple counties in Missouri.  Dr. Case worked directly for St. Louis County as their chief medical examiner since 1988, and she traveled around the country giving lectures and teaching regarding death investigations.  Dr. Case personally performed "somewhere around 11,000 autopsies," including several hundred on children. She testified as an expert in pathology several hundred times.

Dr. Case opined Galen died from blunt-force trauma and was the victim of homicide.  Based on the bruises on Galen's chest, Galen was struck by fists. Galen's

7

liver injury was the kind of injury seen in motor-vehicle accidents. His injuries could not have been caused by another child or by resuscitation efforts.

Dr. Case disputed Dr. Ralston's conclusions. Dr. Case testified, based on her microscopic observations, the ages of the injuries were identical. She noted, however, not all of Galen's injuries were examined microscopically. According to Dr. Case, the type of injury inflicted on Galen's liver usually caused death within an hour. Dr. Case opined the injuries to the liver, as well as the rib injuries, would have caused "very considerable pain." Galen would have been unable to eat. He would remain conscious but not be able to run around and play. Galen's pain would not have been decreased or masked by over-the-counter medication. Dr. Case testified the bruises on Galen's chest resembled knuckle marks.

Dr. Case testified the physical appearance of Galen's liver in the photograph revealed nothing about the injury's age. She could not determine from the photograph whether necrosis existed in the liver. While the liver injury appeared "fresh," Dr. Case explained the only way to determine the age of the liver injury was to examine it microscopically. When she examined a slide containing liver tissue, Dr. Case observed individual liver cells and neutrophil cells. Neutrophils, a type of white blood cell, aid in the inflammatory process. They cause a rise in body temperature and are present in a liver within 20 minutes of an injury. The influx of neutrophils is "one of the very earliest things to happen" after an injury. Dr. Case observed neutrophils in small numbers. Macrophages, cells that engulf dead tissue and bacteria and remove them,

occur later in the inflammatory process, usually in the second or third day after an injury. Dr. Case observed no macrophage cells in Galen's liver. Dr. Case testified, if Galen's injury had been present for several days, there would have been "many more neutrophils" and an influx of macrophages but Galen's "liver does not show that."

Additional testimony at trial included testimony from a police detective who interviewed Petitioner at the hospital on the day of Galen's death. Petitioner reported having attempted CPR on Galen after he was found unresponsive. The State also introduced Petitioner's testimony from the first trial, at which Petitioner testified he, with no medical training, attempted CPR by giving Galen mouth-to-mouth resuscitation and pressing on Galen's chest. He also explained he drove to the hospital while attempting to revive Galen. Ebony testified, after she discovered Galen was not breathing, Petitioner picked up Galen, began shaking him, and attempted to give him CPR.

The jury found Petitioner guilty of first degree murder.

## II.    Post-Trial Motion

Petitioner filed a posttrial motion alleging that one of the jurors, Robbins, was connected in certain ways to Galen's family, such as that she was a friend of Ebony and Ebony's sister. The State opposed the motion and filed affidavits from Robbins, Ebony, and Ebony's sister, and called Galen's father to testify as a proffer at a hearing on Petitioner's motion. The trial court concluded that Petitioner was not denied his right

to an impartial jury because Robbins was not a friend of Ebony nor was she influenced by any other family member.

## III. Direct Appeal

On appeal, Petitioner argued that (1) the evidence was insufficient to convict him of murder beyond a reasonable doubt; and (2) the trial court erred by failing to hold a full evidentiary hearing regarding his allegations about juror Robbins, where Robbins and others could testify. The appellate court rejected those arguments and affirmed Petitioner's conviction. Petitioner filed a petition for leave to appeal (PLA) to the Illinois Supreme Court. The United States Supreme Court denied his petition for a writ of certiorari in October 2014.

## IV. Postconviction Proceedings

In April 2015, Petitioner filed a *pro se* postconviction petition. Petitioner was appointed counsel, who filed an amended petition alleging several claims. The circuit court dismissed all of Petitioner's claims except for his allegations that (1) he was actually innocent because Galen died of unknown causes, and the injuries revealed by the autopsy were the result of Petitioner attempting to save Galen's life by performing CPR; and (2) trial counsel was ineffective for not raising the CPR defense.

An evidentiary hearing was held. At the evidentiary hearing, Petitioner called Dr. Thomas Young, a licensed forensic pathology consultant board certified in anatomic, clinical, and forensic pathology. Dr. Young had performed approximately 5,600 autopsies and had testified approximately 500 times.

Dr. Young reviewed the autopsy report, photographs, police reports, and trial transcripts. He did not recall any mention of Petitioner performing CPR on Galen in the expert reports or trial testimonies. Dr. Young noted that the autopsy showed only a small amount of blood in the abdomen, which he believed indicated little to no blood circulation at the time of the liver injury. He explained that if the liver had been lacerated while the heart was active, more blood would have been found. He suggested that if CPR had been performed improperly, especially using adult-style CPR on a small child, it could have led to the injuries seen in the autopsy.

Dr. Young discussed the differences between adult and child CPR, emphasizing that adult CPR involves stronger compressions than those appropriate for children. He opined that improper adult CPR could cause internal injuries like liver lacerations and rib fractures in a child. While he acknowledged literature suggesting CPR doesn't typically cause such injuries in children, Dr. Young criticized it, noting that cases with such injuries are often categorized as child abuse and excluded from studies. He asserted that injuries from CPR in adults are common and that similar injuries could be expected in children if CPR was performed improperly.

Dr. Young did not form an opinion on the cause of Galen's death, stating there was insufficient information, although he concluded it was "possible" that Galen's injuries could be attributed to improperly performed CPR. Dr. Young explained that witness testimony indicated CPR had been performed, but no one had observed child abuse. It was something that was "theoretical and hypothetical." Dr. Young opined the

11

following: "There are a lot of forensic pathologists who have very, very little information from witnesses. They simply look at the autopsy report and they draw a conclusion from what they see at the autopsy. If the injuries look really bad to them, they're going to call it child abuse. This happens frequently, and it is unfortunate that it does." Dr. Young advised one cannot look at autopsy findings and imagine a scenario. The appropriate approach "deductively and logically and reasonably is to listen to the people who were there to see what happened and test what they saw by the autopsy findings."

Dr. Young referenced a previous case where CPR on an infant caused similar injuries, such as rib fractures and liver lacerations, due to improper adult-style CPR. He reiterated concerns about studies that exclude cases involving CPR injuries, arguing that such injuries are not given proper consideration due to assumptions of child abuse.

Dr. Young concluded that if CPR was performed on Galen in the way described by witnesses, the injuries observed were consistent with the findings from improper adult-style CPR. He also criticized Dr. Case and Dr. Ralston for focusing on autopsy findings and jumping to conclusions about child abuse without considering witness accounts.

Dr. Case testified at the evidentiary hearing about Galen's injuries and cause of death. She described extensive trauma, including a large liver laceration, hemorrhaging in various abdominal areas (such as the spleen, stomach, and pancreas), and deep

muscle hemorrhaging in the pelvic region. In addition, Galen had rib fractures, which could result from striking or squeezing.

When asked why she believed Galen's death was a homicide, Dr. Case explained that the extent of the injuries could not be explained by an accident, pointing out marks on Galen's body that resembled knuckle marks. She opined that these injuries were not consistent with CPR. Dr. Case testified that she regularly autopsies children who had CPR performed, and those children do not show the kinds of injuries seen in Galen's case. She further explained that literature supports her view that CPR does not typically cause such injuries in children, and there is no new literature to suggest otherwise. While adults commonly suffer rib fractures due to the rigidity of their bodies, children's more pliable bodies do not typically suffer the same injuries from CPR.

Dr. Case was familiar with Dr. Young and disagreed "with his ideas about his theory of if you have injuries and you have a witness statement and they match, that you have to believe it because the injuries always seem to match." She recounted an incident in which Dr. Young's theory on CPR-related injuries led to his removal from the list of doctors who could conduct child autopsies in Missouri. Dr. Case emphasized that the cause of death is determined by a thorough investigation, including the autopsy, photographs, medical history, police reports, and witness statements, rather than solely by physical injuries.

Petitioner's attorney, Dan Fultz, also testified. Regarding Dr. Bowman, Fultz testified he was aware she failed the forensic pathologist exam multiple times. He was

further aware she had "diagnosed a young kid in Springfield with a medical condition that was, like, so rare that it was almost unheard of." In addition, when the defense was trying to get the liver sample slides from the State, it took months. The State admitted they did not know where the slides were. Ultimately, they were found in Dr. Bowman's personal refrigerator. He knew the Sangamon County state's attorney had asked the coroner to fire Dr. Bowman. Dr. Bowman was "kind of the laughing stock of the forensic science community for a while."

Fultz said that before trial he asked Dr. Ralston (the defense expert) whether CPR could have caused Galen's injuries, and Ralston said it could not. Fultz explained that his strategy was to focus on the theory that Galen incurred his injuries days before his death (when he was around other adults) because Ralston supported that theory. As Fultz put it, he did not raise a CPR theory because "I didn't want to confuse other issues with my theory of the case, and Dr. Ralston had told me that he did not think the injuries could have resulted from — from CPR."

The circuit court entered a written order in February 2020, denying Petitioner's claims. The court concluded "Dr. Young did not have an opinion on the cause of death of the child but did testify that it was possible that a forceful adult[-]style CPR improperly performed could lead to the injuries discovered in the autopsy." The court stated it, after reviewing the medical literature and the testimony of Drs. Young and Case, found the medical literature was not "of such a conclusive character [it] would probably change the results at re-trial." As to the effectiveness-of-counsel claim, the

court found Fultz was "extremely prepared" for trial and pursuing a defense the injuries were older, given Dr. Ralston's testimony, was sound trial strategy. The court found Fultz's representation did not fall below an objective standard of reasonableness and no reasonable probability the outcome of the trial would be different had defendant retained an expert like Dr. Young before trial.

On appeal, Petitioner alleged (1) he was actually innocent, based on Young's testimony; (2) trial counsel was ineffective for failing to pursue the CPR theory; and (3) prosecutors violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose information about Dr. Bowman's background that Petitioner believed raised questions about her competency. The appellate court rejected those arguments and affirmed the circuit court's judgment. The Illinois Supreme Court denied the PLA in September 2022. *People v. Campbell*, 197 N.E.3d 1071 (Ill. 2022) (Table).

## V.    Federal Habeas Proceedings

In March 2023, Petitioner filed a timely federal habeas corpus petition alleging the following grounds:

(1)    Petitioner is actually innocent because new evidence shows that Galen's cause of death is unknown and his injuries resulted from Petitioner performing CPR while trying to save Galen's life;

(2)    the evidence at trial was insufficient to convict Petitioner of first degree murder;

(3)    Petitioner was denied his right to an impartial jury due to juror Robbins's connections to Galen's family;

(4)    trial counsel was ineffective for not raising the CPR defense; and

(5)     the state violated *Brady* by failing to disclose Dr. Bowman's alleged
         history of incompetency.

Dkt. # 1, at 5–14.

After Respondent answered the petition, Petitioner moved to supplement it. He attached Dr. Young's expert report and articles regarding the possibility that CPR can cause injuries, and slightly modified or added details to two of his arguments. Respondent did not object to the supplement, and so the Court will consider the petition and the supplement together as one.

## LEGAL STANDARD

This Court can grant a petition for a writ of habeas corpus by a state prisoner only if he is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under this statute, the Court must give "full effect" to state judgments that are consistent with federal law. *Williams v. Taylor*, 529 U.S. 362, 383 (2000). Thus, the Court applies a deferential standard of review and gives the Illinois court rulings the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). At the same time, as a *pro se* litigant, the Court must construe Petitioner's petition liberally. *Ward v. Jenkins*, 613 F.3d 692, 697 (7th Cir. 2010).

Federal habeas relief may be granted to a petitioner who can establish that the state court's adjudication of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or where the state court's decision was

"based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Under Section 2254(d)(1), the "contrary to" and "unreasonable application" clauses are given independent meaning. *Williams*, 529 U.S. at 405. A state court decision is "contrary to" established Supreme Court precedent if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if the state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]." *Id.*

A state court decision is "an unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or if the state court "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. The reasonableness inquiry "is quite deferential, such that a state decision may stand so long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005).

"Under [Section] 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (citing *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003)). A state court's factual determinations are

presumed correct, and the burden rests upon the petitioner to rebut that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## DISCUSSION

### I.    Ground 1: Actual Innocence

Petitioner's habeas petition is denied as to Ground 1.  Actual innocence has never been recognized as a freestanding constitutional claim.  *Dixon v. Williams*, 93 F.4th 394, 406 (7th Cir. 2024).  However, a petitioner may use a claim of actual innocence as a gateway to overcome a procedurally defaulted habeas claim.  *Id.* at 403. Petitioner clarifies in his reply brief that this is what he is attempting to do.  Thus, Petitioner's arguments pertaining to actual innocence will be considered when the Court addresses Respondent's procedural default arguments below.

### II.    Ground 2: Sufficiency of the Evidence

Ground 2 alleges that the evidence at trial was insufficient to support Petitioner's conviction.  To succeed on this claim, Petitioner must show that the state appellate court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *see also Saxon v. Lashbrook*, 873 F.3d 982, 987 (7th Cir. 2017) ("Generally, we review habeas challenges to the sufficiency only under [Section] 2251(d)(1).").

The applicable Supreme Court precedent regarding the sufficiency of the evidence is well established: "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Thus, habeas reviews of *Jackson* claims are subject to two levels of judicial deference creating a high bar: first, the state appellate court determines whether any rational trier of fact could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). The sufficiency of the evidence review authorized by *Jackson* is limited to "record evidence." *Herrera v. Collins*, 506 U.S. 390, 402 (1993)

When conducting a sufficiency-of-the-evidence inquiry on a habeas corpus petition, "the only question under *Jackson* is whether [a] finding [is] so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S.at 656. The relevant question is *not* whether this Court disagrees with the state court's resolution of the case. "AEDPA deference would mean little if the test were so lenient." *Smith v. Brookhart*, 996 F.3d 402, 413 (7th Cir. 2021). Instead, this Court "must find the decision not just wrong, but well outside the boundaries of permissible outcomes." *Id.*

Petitioner has not met this high burden. All three experts agreed that Galen died due to blunt force trauma; only the timing was at issue. Drs. Case and Bowman testified that the autopsy results showed that Galen incurred his injuries on the morning of his death, when Petitioner was alone with Galen. While Dr. Ralston testified that Galen sustained his injuries prior to the day of his death, this conclusion is contradicted by

testimony of Galen's mother, father, and grandmother. These witnesses testified that Galen was acting normally in the days before his death, and did not appear to be suffering from massive, painful injuries. All three experts testified that CPR did not cause Galen's injuries.

In arguing the evidence was insufficient to support a conviction, Petitioner primarily takes issue with Dr. Bowman's testimony and credibility. However, "defendants who challenge the sufficiency of the evidence supporting a jury verdict face an uphill battle, and nowhere is this more true than when it comes to credibility determinations." *United States v. Caguana*, 884 F.3d 681, 688 (7th Cir. 2018) (cleaned up). Here, Dr. Bowmen's conclusions about the timing of Galen's death are supported by Dr. Case as well as Galen's family members. It was not unreasonable for the jury to accept Dr. Case's opinion, given her extensive experience, including performing over 11,000 autopsies, hundreds of which were on children.

Viewing the evidence in the light most favorable to the prosecution, the Court finds no error in the appellate court's application of the *Jackson* standard and resultant conclusion. Petitioner has not shown that there could be *no* reasonable juror that would convict him. And Petitioner's arguments about newly discovered evidence are misplaced, because the Court's review of the sufficiency of the evidence claim is limited to the record evidence. Petitioner's habeas petition is denied as to Ground 2.

20

### III. Grounds 3, 4, and 5

Respondent argues Grounds 3–5 are procedurally defaulted. To preserve a claim for federal habeas review, "state prisoners must give the state courts one full opportunity" to resolve the prisoner's claim by raising it through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In Illinois, a habeas petitioner must present his claim to all three levels of the Illinois courts — trial, appellate, and supreme court — to avoid procedural default. *Id.*

Respondent asserts that Petitioner raised Ground 3 (alleging that juror Robbins was not impartial) in the appellate court on direct appeal, but not in his ensuing PLA, and raised Grounds 4 (alleging that trial counsel was ineffective for failing to raise the CPR defense) and 5 (alleging that prosecutors failed to disclose information about Bowman's background) in his postconviction appeal, but not his postconviction PLA.

The Court agrees with Respondent as to Ground 3. Petitioner's direct appeal PLA makes no mention of the jury, individual jurors, or juror impartiality or bias. In his reply brief, Petitioner does not even mention or respond to Respondent's procedural default *or* merits arguments regarding Ground 3. Ground 3 is procedurally defaulted.

The same goes for Ground 5, Petitioner's *Brady* claim. Petitioner's postconviction PLA does not reference any investigation into Dr. Bowman or any evidence he contends the prosecution failed to disclose. Petitioner himself concedes

that Ground 5 was not raised in his postconviction PLA.  *See* Dkt. # 14, at 6.  Ground 5 is procedurally defaulted.

Whether Ground 4 is also procedurally defaulted presents a closer call. However, there are only two references to trial counsel in Petitioner's postconviction PLA – where he recounts the claims that were raised in his amended postconviction petition, and where he states that the trial court found that his trial counsel was not ineffective.  The focus of Petitioner's PLA was: "This case presents the question of what constitutes evidence of actual innocence which would probably change the result of the trial."  In any event, Petitioner explicitly concedes in his Reply that this claim is procedurally defaulted.  *See* Dkt. # 26, at 11.  Ground 4 procedurally defaulted.

Procedural default may be excused, however, where the petitioner demonstrates either (1) "cause for the default and actual prejudice" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice[,]" i.e., a showing of actual innocence.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Here, Petitioner relies on the "fundamental miscarriage of justice" exception to excuse his procedural default.

"To demonstrate a fundamental miscarriage of justice, a petitioner must show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent' such that 'it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence.'"  *Thomas v. Williams*, 822 F.3d 378, 386–87 (7th Cir. 2016) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  The actual innocence gateway standard is onerous and demanding, such that

review is allowed only in extraordinary cases. *Patterson v. Adkins*, 124 F.4th at 1035, 1046 (7th Cir. 2025).

Although not subject to strict rules of admissibility, "'[t]o be credible' a gateway claim requires 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *House v. Bell*, 547 U.S. 518, 537 (2006) (alteration in original) (quoting *Schlup*, 513 U.S. at 324). During its review, the Court "consider[s] 'all the evidence, old and new, incriminating and exculpatory, and then "make[s] a probabilistic determination about what reasonable, properly instructed jurors would do." *Patterson*, 124 F.4th at 1046 (quoting *House*, 547 U.S. at 538). It is not the Court's function to make independent factual determinations as to what likely occurred in the case; instead, the Court is only tasked with assessing the likely impact of the evidence on reasonable jurors. *Blackmon v. Williams*, 823 F.3d 1088, 1102 (7th Cir. 2016) (quoting *House*, 547 U.S. at 538).

Petitioner's new evidence consists of Dr. Young's expert report and three articles about CPR-related injuries. As an initial matter, the articles don't do much to support Petitioner's claim of actual innocence. For example, "Abstract 103" states that the study included only adult patients. The article from the *Egyptian Journal of Forensic Science* states that the study was based on data from people aged 17 to 78, and their average age was 47. As Respondent points out, the article from Plum X Metrics does

not identify the age of the people involved in the study; however, it is reasonable to infer that it primarily included adults.

In his expert report, Dr. Young states, "Forceful adult-style cardiopulmonary resuscitation (CPR) improperly performed by an untrained person on an 18-month-old can lead to the injuries discovered in this autopsy." Dr. Young further concludes, "In other words, the physical consequences described at autopsy are consistent with the accounts of multiple witnesses who were present to see what happened. As such, there is no reason in this case to speculate about child abuse." This conclusion and Dr. Young's testimony at the postconviction hearing that it is "possible" Galen's injuries might have been caused by Petitioner performing CPR is contrary to the testimony of every other expert in this case. All three experts, including Petitioner's expert Dr. Ralston, testified at trial that CPR was not the cause of Galen's injuries. Dr. Case reiterated that point during the postconviction evidentiary hearing. Notably, Dr. Young admitted that although he had performed thousands of autopsies, he had personally seen only one other case with injuries similar to Galen's where he opined a child's injuries were caused by CPR. This, however, was the case that led to Dr. Young being removed from the list of doctors who were allowed to perform autopsies of children in Missouri. Furthermore, Young admitted there could be "scenarios" in which the injuries Galen suffered could be caused by abuse.

Petitioner's claim that he is innocent based on new medical literature and Dr. Young's testimony that Galen's cause of death is unknown, and his injuries may

have been caused by CPR, does not meet the demanding standard for actual innocence. Petitioner has failed to demonstrate that he is actually innocent, so there is no basis to excuse his procedural default. The petition is denied as to Grounds 3, 4, and 5.

## IV. Certificate of Appealability

For the reasons stated above, Petitioner's habeas petition is denied, and the Court declines to issue a certificate of appealability. 28 U.S.C. § 2253(c)(2). The Court cannot conclude "both 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Gonzalez v. Thaler*, 65 U.S. 134, 140–41 (2012) (quoting *Slack v. McDonald*, 529 U.S. 473, 484 (2000)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion under Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed

within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## CONCLUSION

For the foregoing reasons, Petitioner's petition for a writ of habeas corpus [1] is denied and the Court declines to issue a certificate of appealability. The Clerk directed to enter a Rule 58 judgment in favor of Respondent and against Petitioner. Case terminated.

It is so ordered.

Dated: March 25, 2025

Charles P. Kocoras
United States District Judge